STATE OF CONNECTICUT *v.* JOHN MANCINONE
(5046)

BORDEN, O'CONNELL and FOTI, Js.

Argued March 2—decision released July 19, 1988

*J. Daniel Sagarin,* with whom was *Thomas E. Farver,* for the appellant (defendant).

*Patricia A. King,* deputy assistant state's attorney, and *Maureen Keegan,* certified legal intern, with whom, on the brief, were *John A. Connelly,* state's attorney, and *Bradford J. Ward,* assistant state's attorney, for the appellee (state).

BORDEN, J. The defendant appeals from the judgment of conviction, after a jury trial, of two counts of risk of injury to a minor in violation of General Statutes § 53-21,[1] and illegal possession of marihuana in violation of General Statutes § 21a-279 (c).[2] The jury found him not guilty of two counts of sexual assault in the second degree in violation of General Statutes

---

[1] General Statutes § 53-21 provides in pertinent part: "Any person who wilfully or unlawfully causes . . . any child under the age of sixteen years to be placed in a situation that its health is likely to be injured, or its morals likely to be impaired," shall be guilty of the offense.

[2] General Statutes § 21a-279 (c) provides in pertinent part: "Any person who possesses . . . less than four ounces of a cannabis-type substance except as authorized in this chapter" is guilty of the offense.

(Rev. to 1983) § 53a-71,[3] and, with respect to these two counts, found him not guilty of the lesser included offenses of sexual assault in the fourth degree in violation of General Statutes § 53a-73a.[4] The court imposed concurrent sentences of six years and eight years on each of the convictions of risk of injury to a minor, and one year on the conviction of possession of marihuana, for a total effective sentence of eight years.

The defendant claims that the judgment of conviction must be reversed on the following grounds: (1) the state's failure sufficiently to particularize the dates of the risk of injury charges violated his constitutional right adequately to present a defense; (2) the evidence regarding the risk of injury charges was insufficient; (3) several evidentiary rulings of the trial court were erroneous; (4) the court committed several errors in instructing the jury; and (5) the court committed several errors in imposing sentence. We find no error.

The jury could reasonably have found the following facts. The defendant was a successful businessman, age sixty-seven at the time of the trial in 1986, who lived with Judy Grice and her children in the defendant's house on Whittemore Road in Middlebury. He also had an apartment on Grand Street in Waterbury. The two victims, who were referred to throughout the trial proceedings as Juvenile One (J1) and Juvenile Two (J2), were age sixteen at the time of trial and approximately ages thirteen and fourteen at the time the crimes were committed.

---

[3] General Statutes (Rev. to 1983) § 53a-71 provided in pertinent part: "(a) A person is guilty of sexual assault in the second degree when such person engages in sexual intercourse with another person and such other person is (1) under fifteen years of age . . . ."

[4] General Statutes § 53a-73a provides in pertinent part: "(a) A person is guilty of sexual assault in the fourth degree when: (1) Such person intentionally subjects another person to sexual contact who is (A) under fifteen years of age . . . ."

Between August, 1982, and November, 1984, the defendant engaged in the following ongoing course of conduct with the two victims, at his house in Middlebury and apartment in Waterbury: on numerous occasions, the defendant gave the two victims beer, wine and marihuana, and offered them money and marihuana in exchange for sexual activities. On several occasions, the defendant asked them if he could see and touch their breasts and vaginas, and the defendant paid them money to show him their breasts. There was a hot tub in the defendant's house. The defendant was nude in the hot tub with J1 and J2, and permitted J2 and her friend, Andrea Keeley, to use the hot tub in the basement of his house, provided that they were nude. While J2 and Keeley were nude in the hot tub, he tried to grab their breasts, and he gave them marihuana in exchange for permitting him to be nude with them in the hot tub. On numerous other occasions the defendant kissed the victims, and tried to touch their breasts. Furthermore, the defendant gave J1 and J2 the key to his apartment and permitted them to have a party there with their friends, at which alcohol and marihuana were used.

There was also evidence, the significance of which we discuss later in this opinion, that on several occasions the defendant had sexual intercourse with the victims, in both his house and his apartment. With respect to the possession of marihuana count, the jury could reasonably have found that on January 4, 1985, the defendant possessed approximately three and three-quarters ounces of marihuana at his house in Middlebury.

I

PARTICULARITY OF THE INFORMATION

The defendant first claims that the state's charging documents were so vague regarding the dates on which

the state claimed he violated General Statutes § 53-21 that he could not properly prepare and present a meaningful defense. He also claims that the court erred in refusing to require the state to make the charging documents more specific. We disagree.

After several motions and requests by the defendant, the state filed an amended bill of particulars and statement of essential facts. The first count of the amended bill of particulars and statement of essential facts alleged that the defendant "violated Connecticut General Statutes Section 53-21, risk of injury to children, in that he placed Juvenile #1, a person under age 16, in a situation where her health was likely to be injured and her morals likely to be impaired by engaging in sexual activity with said juvenile and by providing said juvenile with alcohol and illegal drugs. It is further alleged that these violations occurred at 182 Grand Street, Waterbury, and 106 Whittemore Road, Middlebury, CT, on divers dates between August 1982 and November 1984." The second count was identical to the first count, except that it referred to J2 rather than J1.[5]

The defendant argues that, because he was charged with having committed the offenses between August, 1982, and November, 1984, he could not effectively defend by establishing defenses of alibi and impossibility, and by establishing that the conduct of the victims, on whose testimony the state's case largely

[5] The third count alleged, in similar fashion, a violation of sexual assault in the second degree "in that he engaged in sexual intercourse with J #1, a person under age 15 at 182 Grand Street, Waterbury, and 106 Whittemore Road, Middlebury on divers dates between August 1983 and November 1984." The fourth count was the same as the third count, except that it referred to J2. The defendant was acquitted on these two counts. The fifth count, on which the defendant was convicted, alleged that he possessed less than four ounces of marihuana at 106 Whittemore Road, Middlebury, on January 4, 1985.

rested, on or about particular dates was inconsistent with their testimony. We conclude, however, that under the circumstances of this case the bill of particulars and statement of essential facts were constitutionally sufficient.

In order to enable the defendant to prepare his defense, the state must inform him, within reasonable time limits, when " 'the offense charged was alleged to have been committed. The state does not have a duty, however, to disclose information which the state does not have. Neither the sixth amendment to the United States constitution nor article first, § 8, of the Connecticut constitution requires that the state choose a particular moment as the time of an offense when the best information available to the state is imprecise . . . .' " *State* v. *Evans,* 205 Conn. 528, 536, 534 A.2d 1159 (1987), quoting *State* v. *Stepney,* 191 Conn. 233, 242, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984). This is particularly true where there is no indication that the state could with reasonable certainty provide " 'a narrower time frame than that provided in the bill of particulars . . . .' " Id. Although the date of the alleged crime is material to the defense when an alibi defense is raised, "the effectiveness of the alibi claim is a factual question that is best left to the trier for determination after all the evidence has been presented." Id., 535. Where the offense is of a continuing nature, it may be impossible to provide specific dates in the charging documents. *State* v. *Hauck,* 172 Conn. 140, 150, 374 A.2d 150 (1976). Generally in such cases, "as long as the information provides a time frame which has a distinct beginning and an equally clear end, within which the crimes are alleged to have been committed, it is sufficiently definite to satisfy the requirements of the sixth amendment to the United States constitution and article first, § 8, of the Connecticut constitution. See, e.g.,

*United States* v. *Roman,* 728 F.2d 846, 851 (7th Cir.), cert. denied, 466 U.S. 977, 104 S. Ct. 2360, 80 L. Ed. 2d 832 (1984) (crimes committed over eleven year period); *United States* v. *McCown,* 711 F.2d 1441, 1450 (9th Cir. 1983) (crimes committed over five month period); *People* v. *Baugh,* 145 Ill. App. 3d 133, 495 N.E.2d 688 (1986) (crimes committed over nine month period)." *State* v. *Saraceno,* 15 Conn. App. 222, 237, 545 A.2d 1116 (1988).

In order for a defendant who is convicted on the basis of an imprecise information to prevail on appeal, he must establish "a clear and specific showing of prejudice to the defense . . . . " *State* v. *Hauck,* supra, 151; see *State* v. *Laracuente,* 205 Conn. 515, 518–21, 534 A.2d 882 (1987). Such a showing amounting to a deprivation of his constitutional right to adequate notice of the charges against him is not made, however, merely by establishing that the "presentation of his . . . defense may be more burdensome and difficult." *State* v. *Evans,* supra; *State* v. *Saraceno,* supra.

The theory of the state's case, as disclosed by the charging documents, was that between August, 1982, and November, 1984, the defendant placed the victims in a situation likely to injure their health and impair their morals, by giving them illicit substances and by engaging in sexual activities with them. Thus, the offenses charged were continuing in nature. Furthermore, it is clear from this record that the state could not supply more specific dates with reasonable certainty, because the best information available to it, namely the statements and testimony of the victims, was imprecise. Finally, although the defendant's defense was made more burdensome and difficult by the imprecision of the charging documents, those "burdens and difficulties . . . [were] not of the kind and magnitude to warrant" reversal of the conviction. *State* v. *Evans,* supra, 536. The defendant did not claim that

he was never with the victims within the time period and at the places alleged. He testified that he never engaged in the alleged conduct, whatever the dates. In this connection, he had ample opportunity to impeach the credibility of the state's witnesses, both by cross-examination and by introduction of independent evidence.

## II

### SUFFICIENCY OF THE EVIDENCE

The defendant claims that the evidence of guilt on the two counts of risk of injury to a minor was insufficient. The gist of the defendant's claim of evidentiary insufficiency is that the state's evidence "was so inconsistent and conflicting as to be without probative value." The short answer to this is that such inconsistencies and conflicts are grist for the mill operated by the trier of fact, not by an appellate court; see *In re Robert K.*, 12 Conn. App. 585, 587–90, 532 A.2d 1319 (1987); as long as we, viewing the evidence most favorably to the state, conclude that a rational jury could find guilt proven beyond a reasonable doubt. Gauged by this proper standard, the state's evidence was sufficient.

We also reject the defendant's claim in this regard that the state's failure to prove specific dates and specific acts of misconduct was fatal to its case. "Time is not usually an element of an offense"; *State* v. *Orsini*, 187 Conn. 264, 274, 445 A.2d 887, cert. denied, 459 U.S. 861, 103 S. Ct. 136, 74 L. Ed. 2d 116 (1982); *State* v. *Adams*, 14 Conn. App. 119, 124–25, 539 A.2d 1022 (1988); *State* v. *Bowman*, 3 Conn. App. 148, 155, 485 A.2d 1343 (1985); and it was not here. *State* v. *Hauck*, supra. The state, moreover, produced sufficient evidence of the defendant's course of conduct with the victims, including specific acts of misconduct, to justify the verdict.

## III

### EVIDENTIARY RULINGS

### A

The defendant claims that the court erred by admitting evidence of other sexual conduct between him and Andrea Keeley, an adult. We disagree.

Keeley, a friend of J2, had testified that she went with J2 to the defendant's house on several occasions when the defendant gave her and J2 marihuana, and that the defendant grabbed at J2's breasts while she and Keeley were sitting nude in the defendant's hot tub. The defendant testified on cross-examination that he had seen Keeley only once, in March, 1984, when J2 brought her to his house. The state then elicited, over the defendant's objection, that approximately two weeks later the defendant and Keeley went to New York City where they stayed at a hotel, and the state introduced the hotel bill.

The defendant argues that the admission of the testimony that the defendant and Keeley went to New York City, and the admission of the accompanying hotel bill, violated what he claims to be the holding of *State v. Rothenberg,* 195 Conn. 253, 262, 487 A.2d 545 (1985), "that sex crime defendants, like sex crimes victims, should be shielded from unnecessary prejudicial evidence of their prior sexual conduct." This claim is disposed of by *State v. Scott,* 11 Conn. App. 102, 109–10, 525 A.2d 1364, cert. denied, 204 Conn. 811, 528 A.2d 1157 (1987).

As in *Scott,* the defendant's claim presents "an analysis unburdened by the law or by the facts in the record." Id., 109. The language of *Rothenberg* on which the defendant relies is dictum and does no more than require the court to balance probative value against

prejudicial effect. *State* v. *Scott,* supra. Furthermore, the evidence did not contain any reference to sexual conduct by the defendant. Id. Finally, even if the jury were to infer such conduct from the evidence, which the court admitted for credibility purposes, we could not conclude that its prejudicial effect outweighed its probative value. Id., 109–10.

## B

The defendant next claims that the court erred in refusing to grant a mistrial or to strike the testimony of Keeley because of the destruction of certain notes of an interview conducted with her by Officer Daniel T. Gardner of the Middlebury police department. We disagree.

Keeley testified for the state. On direct examination, she corroborated the testimony of J2 regarding the defendant's supplying J2 with marihuana and alcoholic drinks, regarding the defendant's use of his hot tub to view J2 in the nude and to try to touch her breasts, regarding the defendant's remarks about the size of J2's breasts, and regarding the use by J1 and J2 of the defendant's apartment for a party.

Gardner interviewed Keeley approximately three times, the first of which was an approximately three hour interview occurring in January or early February, 1985. The defendant's claim involves Gardner's notes of that interview. Gardner testified that he took notes simultaneously as Keeley spoke and that he recorded what she said as accurately as he could. He also testified that it was his practice at that time to destroy his interview notes unless the notes were to be used as a basis for a statement by the witness. He testified further that he destroyed those notes because he did not think she said anything substantial about the case "with the exception of a couple of things." He also testified, however, that he put the substance of the notes in the

affidavit for a subsequent search and seizure warrant directed at the defendant's house and apartment.[6]

On the basis of the destruction of Gardner's notes of his interview with Keeley, the defendant moved for a mistrial and, in the alternative, that Keeley's direct testimony be stricken. The court denied the motion.

The defendant claims that the court erred because of the degree of the state's culpability in destroying the notes and the prejudice to him resulting from that destruction. This argument is without merit.

The state does not dispute, and we agree, that Gardner's notes constituted a "statement" of Keeley, access to which the defendant would ordinarily be entitled after Keeley's direct testimony. Practice Book § 752. A police officer's interview notes constitute a statement of the witness interviewed if they come within either definition of "statement" under Practice Book § 749. *State* v. *Myers,* 193 Conn. 457, 470, 479 A.2d 199 (1984). Gardner's testimony brought his notes of Keeley's interview within the terms of Practice Book § 749 (2) as a "substantially verbatim recital of an oral statement made by a person and recorded simultaneously with the making of such oral statement."

Where such a statement has been rendered inaccessible by action of the state, in the absence of bad faith, the determination of whether the testimony of the witness should be stricken or a similar sanction imposed depends on the balance between the extent of the state's culpability and the prejudice to the defendant. *State* v. *Mullings,* 202 Conn. 1, 10, 519 A.2d 58 (1987).

[6] Gardner also testified that subsequently the state's attorney issued a memorandum requesting that the police retain their notes on major investigations, and that in accordance with that policy he had retained his notes of his final interview with Keeley, which took place in October, 1985. These notes were made available to the defendant pursuant to an order of the trial court.

Since the defendant has no constitutional right of access to such a statement, he must show prejudice. Id., 8. The trial court has broad discretion in striking this balance. Id., 10.

Although the defendant claims that the state was "definitely culpable" in destroying the notes, he does not claim bad faith. We therefore employ the balancing test urged on us by the defendant and required by the cases. That test leads us to conclude that the trial court did not err. The extent of the state's culpability is not severe. Although Gardner destroyed his notes several months after our Supreme Court's decision in *State* v. *Myers,* supra, it was approximately nine months prior to the decision in *State* v. *Milum,* 197 Conn. 602, 500 A.2d 555 (1985), when the court reiterated its disapproval of destruction of discoverable material. See *State* v. *Mullings,* supra. Furthermore, there is no evidence that Gardner's prior practice of destroying notes was not in conformity with standard police procedure or in reckless disregard of the defendant's rights and applicable Supreme Court precedents.

The defendant has failed, moreover, to identify any prejudice flowing from the destruction of Gardner's notes. Despite ample opportunity to do so, he did not establish that the notes contained anything inconsistent with Keeley's direct testimony. Indeed, he never asked either Keeley or Gardner whether there was anything discussed by her in that interview which contradicted or was in any way inconsistent with her direct testimony, or which could have in any other way served as a basis for impeachment of that testimony. In addition, much of what Keeley told Gardner was incorporated into the search warrant affidavit, to which the defendant had access.

## C

The defendant next claims that the court erred by admitting into evidence the testimony of certain witnesses regarding statements made to them by J1 and J2, in violation of the requirements of the constancy of accusation rule. We agree with the state that none of these claims of error is reviewable because the grounds raised on appeal were not presented to the trial court.

The trial court admitted certain constancy of accusation testimony of Keeley and Mark Grandpre regarding statements made to them by J2, and certain constancy of accusation testimony of William Cole regarding statements made to him by J1. On appeal, the defendant claims that the court erred (1) with respect to Grandpre's testimony because his testimony was beyond the scope of what J2 had testified she told him, (2) with respect to Keeley's testimony because J2 had not testified that she had complained to Keeley about the defendant, and (3) with respect to Cole's testimony because J1 had not testified that she complained to Cole about the defendant. The gist of the defendant's argument on appeal regarding Keeley's testimony and Cole's testimony was that there was no prior testimony by J2 and J1 that they "made complaint to some other person[s]"; *State* v. *Brice,* 186 Conn. 449, 453–54, 442 A.2d 906 (1982); namely, Keeley and Cole, respectively.

The defendant's objection to Grandpre's testimony followed a voir dire in the absence of the jury. The basis of the objection, made in the presence of the jury, was "for the reasons stated to the Court in the absence of the jury." In the absence of the jury, however, the "reasons" stated by the defendant constituted a request for a limiting instruction and a reference to a particular

passage in C. Tait & J. LaPlante, Connecticut Evidence (1985 Supp.) § 11.22, p. 155. We have examined that passage which the defendant presented to the court in support of his objection. It explains the rationale for the admission of constancy of accusation testimony, but it does not refer to the ground of objection which the defendant presses on appeal. Thus, the ground claimed on appeal was not presented distinctly to the trial court. Practice Book § 288. The same is true of Keeley's testimony, to which the defendant simply stated, "Objection."

In a voir dire conducted in the absence of the jury, Cole testified that J1 told him that one time the defendant pushed her down on the bed, that the defendant had "made passes" at her, and that she referred to the defendant as a perverted old man. The bases of the defendant's objection were (1) that J1 had not testified that the defendant had pushed her down on the bed, and therefore that statement of J1 to Cole was beyond the constancy of accusation rule, and (2) that "[w]e don't think that it is constancy of accusation that he made passes at her." The court sustained the defendant's first objection and overruled the second. Thus, the defendant did not distinctly present to the trial court the claim he now makes, namely, that J1 never complained to Cole about the defendant. Practice Book § 288.

## D

The defendant next attacks the court's denial of his motion to suppress as evidence three bags of marihuana and two packages of cigarette rolling paper seized from his home pursuant to a search warrant. The defendant's attack is three-pronged: (1) the information contained in the search warrant affidavit was stale; (2) the execution and return of the warrant violated General Statutes (Rev. to 1985) § 54-33c; and (3) the state

improperly withheld critical information from the judge issuing the warrant. These arguments are without merit.

### 1

We first consider the defendant's argument that the information in the search warrant was impermissibly stale. The affidavit of Gardner and Robert Prasauckas of the Middlebury police department, dated January 3, 1985, contained the following representations. On November 26, 1984, Gardner received a complaint from a fifteen year old juvenile, identified as J1, who stated that in 1983, while she was age thirteen and was working for the defendant at his home, the defendant would make liquor available to her and to J2, also age thirteen, and would engage in sexual contact with them. J1 stated that in 1983 the defendant took her and J2 to his apartment on Grand Street in Waterbury, where he engaged in sexual intercourse with them, for which their payment was marihuana, liquor and the key to the apartment. J1 also stated to Gardner that from then until August, 1984, the defendant regularly had sexual intercourse with both juveniles at his home on Whittemore Road, and that "prior to these acts, [the defendant] would give marihuana to the juveniles, [and] [t]hat marihuana was also always present as well as lewd magazines at his house on Whittemore Rd."

Gardner stated further in the affidavit that on December 5, 1984, he interviewed Judy Grice, age thirty-five, who was the defendant's former girlfriend. She told Gardner that the defendant owned an apartment on the fifth floor of 182 Grand Street, Waterbury, and that the defendant smoked marihuana and drank liquor with J1 and J2 at his home on Whittemore Road. Grice also "indicated that [the defendant] stores his marihuana in a drop ceiling near the bar area and in his clothes closet in his home . . . ."

Gardner also stated that he interviewed a minor male "who stated that in 1984, he was given liquor by [the defendant] and was offered marihuana which he observed at [the defendant's] house. That at that time, the minor stated that he saw Juvenile #2 and that she appeared to be 'high'. . . . That the minor was at the apartment in Waterbury [182 Grand Street] where liquor and marihuana were present."

The defendant argues that there was no probable cause to believe that, on January 3, 1985, the defendant possessed marihuana at his home, because the "alleged criminal activities . . . by the State's best information had terminated by August, 1984," and that the failure of the affidavit to establish probable cause that the defendant was engaged in a continuing course of illegality "negates the likelihood that any evidence of such alleged conduct would be present 5 months after its conclusion." We disagree, and we conclude that for a coalescence of reasons the affidavit was sufficient.

First, the affidavit indicated that the defendant's possession of marihuana was ongoing and was not an isolated instance. It indicated the presence of marihuana at the defendant's house beginning in 1983 and stretching forward at least "until August 1984." It also indicated that during that period the defendant would, in connection with the two juveniles and the unidentified minor male, use the marihuana on an ongoing basis. Thus, the issuing judge had a basis to infer that the defendant's course of illegal possession of marihuana was continuing. See *State* v. *Garcia,* 7 Conn. App. 354, 508 A.2d 824 (1986). Second, Grice stated on December 5, 1984, less than one month prior to the affidavit, that the defendant *"stores* marihuana in a drop ceiling near the bar area and in his clothes closet in his home." This use of the present tense by Grice can, at least together with other facts, serve as a basis for a finding of probable cause at that time. W. LaFave,

Search and Seizure § 3.7 (b) n.72. Third, the determination of probable cause in this case presents a close question. Under these circumstances, deference must be given to the validity of the warrant. *State* v. *Brown*, 14 Conn. App. 605, 615, 543 A.2d 750 (1988).

2

The defendant next claims that the evidence should have been suppressed because, in the execution and return of the warrant, the state violated General Statutes (Rev. to 1985) § 54-33c by failing to provide the issuing judge with necessary information to waive the statutory requirement that copies of the warrant application and affidavit be delivered to the defendant, as the owner of the house involved.[7] We disagree.

General Statutes (Rev. to 1985) § 54-33c provided in pertinent part that where a search warrant is executed, "[w]ithin forty-eight hours of such search, a copy of the application for the warrant and a copy of all affidavits upon which the warrant is based shall be given to" the owner or occupant of the dwelling searched. It also provided that the issuing judge could dispense with such requirement if the applicant for the warrant "demonstrates to the judge that (1) the personal safety of a confidential informant would be jeopardized by the giving of a copy of the affidavits at such time, or (2) the search is part of a continuing investigation which would be adversely affected by the giving of a copy of the affidavits at such time . . . . " General Statutes (Rev. to 1985) § 54-33c.[8]

---

[7] The defendant assumes without argument that a violation of General Statutes § 54-33c would also require suppression of the evidence because it would mean that "the warrant was illegally executed," within the meaning of General Statutes § 54-33f (a) (5), our suppression statute. That is not at all clear. We need not address this question, however, because we conclude that no such violation occurred in this case.

[8] Public Acts 1985, No. 85-306, amended General Statutes § 54-33c by requiring that the judge's order dispensing with the requirement of ser-

The state complied with the statutory requirement in this case. The warrant was accompanied by an application of Gardner and Prasauckas to dispense with the service requirement, which the judge granted, stating that the personal safety of a confidential informant would be jeopardized by the giving of a copy of the affidavit at that time, and stating that the search was part of a continuing investigation which would be adversely affected by a giving of a copy of the affidavit at that time. Furthermore, in the search warrant affidavit itself, Gardner and Prasauckas had stated "[t]hat both juveniles and the [male] minor expressed fear that their welfare would be jeopardized if their identities were made known within the immediate future."

3

The defendant next claims that the application for the warrant was insufficient because it failed to advise the judge of the criminal records, psychiatric records "and other problems of the informants despite [the state's] knowledge of same," and thus denied the judge "information critical to a determination of the informants' competency, credibility and bias." This broadside attack on the application for the warrant is utterly without merit. First, the defendant fails to identify anything regarding the alleged criminal records, psychiatric records or "other problems" of any of the informants of which Gardner or Prasauckas was aware. Second, if the defendant is raising a claim under *Franks* v. *Delaware,* 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), to which he does not refer in his brief, this claim is meritless. The trial court specifically ruled that the defendant had not made the required prelimi-

vice on the property owner be based on a "detailed affidavit" demonstrating to the judge, inter alia, that an informant's safety would be jeopardized or that the warrant is part of a continuing investigation. See General Statutes § 54-33c. That act, however, did not apply to this case because it was not effective until October 1, 1985.

nary showing under *Franks,* which the defendant does not challenge on appeal, and the appellate record and his appellate brief are simply bereft of any basis for such a challenge.

## E

The defendant's next evidentiary claim is that the court unconstitutionally limited his cross-examination of J2 by refusing to permit him to cross-examine her regarding conversations with her attorney. This argument is without merit.

During cross-examination in the presence of the jury, the defendant elicited from J2 that she had spoken with attorney Robert Mellon of Waterbury. The jury was then excused and in its absence it was established that during the previous week J2 had spoken with Mellon at her father's direction. It was also established that Mellon had appeared in court as her attorney in connection with earlier proceedings in this case. The court refused to permit the defendant to inquire about conversations between J2 and Mellon, and the defendant duly excepted. The parties stipulated that an attorney-client relationship existed between J2 and Mellon, and this stipulation was presented to the jury when it returned to the courtroom.

We agree with the defendant that cross-examination regarding whether a complaining witness contemplates a suit against the defendant arising out of the incident in question is relevant to the possible bias, motive or interest of the witness; *State* v. *Milum,* 197 Conn. 602, 611–12, 500 A.2d 555 (1985); and that such inquiry is constitutionally protected. *State* v. *Privitera,* 1 Conn. App. 709, 711–13, 476 A.2d 605 (1984). The court's ruling in this case, however, did not impermissibly limit that inquiry.

Precluding the defendant from eliciting attorney-client conversations did not preclude him from cross-examining J2 about her financial intentions or expectations. The defendant was free to cross-examine her, without eliciting those conversations, regarding whether she contemplated suing the defendant. In fact, he did ask her whether she had told someone else that she was "involved in a rape case and [was] going to make a lot of money." Furthermore, it was established in the voir dire in the absence of the jury that J2 spoke to Mellon at her father's request, that she was a minor living in her father's house, and that her father was her guardian. Under these circumstances, the defendant was invited by the court to bring in and inquire of her father, who was in effect J2's alter ego for purposes of the contemplated suit against the defendant. The defendant, after stating that he expected to do so, declined the invitation. The court's ruling did not, therefore, prevent the defendant from exposing to the jurors facts from which they could appropriately draw inferences regarding J2's reliability as a witness. Id., 712.

F

The defendant's final evidentiary claim involves certain exhibits which the court ordered to be sealed. The defendant was denied access to these exhibits. In his brief the defendant asserts that seven of these exhibits contain "family relations records, school records and youth service records," and that six of them were witness interview notes to which access was denied. The defendant's entire argument on this claim of error consists of the following: "We ask this court to review the sealed material with a liberal view to matter exculpatory in nature, inconsistent with the state's position or in any way helpful to the defense." We decline to review this claim.

The trial court record consists of fifteen volumes of transcript and numerous exhibits. We have no way of knowing, from the defendant's brief or appendix, what claims or preliminary showings he made at trial. See, e.g., *State* v. *Burak,* 201 Conn. 517, 524, 518 A.2d 639 (1986); *State* v. *Esposito,* 192 Conn. 166, 179–80, 471 A.2d 949 (1984); Practice Book § 741. The defendant's claim on appeal hardly comports with even a minimal pass at compliance with our rules. Practice Book § 4065 (d) (3); *State* v. *Siller,* 12 Conn. App. 395, 402, 530 A.2d 1106 (1987).

## IV

### JURY INSTRUCTIONS

#### A

We next consider the defendant's claim that the court erred in its instructions to the jury regarding unanimity. This claim arises out of the following procedural context. The jury asked the court: "In [counts] one and two, is impairing morals or risk of injury to minor alcohol or marihuana or sexual activity or must it be all three?" The court responded: "If any one of the three, as long as with all the other parts of the statute are proven beyond a reasonable doubt, all the definitions that I charge you. Do you remember all that? All right. You may go back." The defendant excepted to the court's response, but his exception did not encompass a lack of unanimity claim.

The defendant now claims that the court's response was erroneous because it did not specifically instruct the jury that its verdict must be unanimous with respect to each of the three categories of conduct claimed by the state, namely, giving alcohol to the victims, giving marihuana to them, and engaging in sexual activity with them. Under the circumstances of this case, we reject the defendant's claim.

Although the defendant did not except to the court's instructions on unanimity grounds, his claim does qualify for limited review under *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973). See *State* v. *Benite,* 6 Conn. App. 667, 671, 507 A.2d 478 (1986). We therefore "conduct a limited review to determine whether the defendant was deprived of a fundamental right and a fair trial, and if so, whether reversal of the resulting judgment is required." Id.

In *State* v. *Benite,* supra, 674–75, we held that "[i]f the actions necessary to constitute a violation of one statute or subsection of a statute are distinct from those necessary to constitute a violation of another, then jurors who disagree on which one the state proves cannot be deemed to agree on the actus reus: the conduct the defendant committed. Where the evidence presented supports both alternatives, the possibility that the jurors may actually disagree on which alternative, if either, the defendant violated is the highest. Under such circumstances, the jurors should be told that they must unanimously agree on the same alternative. We do not now hold that the kind of charge countenanced in [*United States* v. *Gipson,* 553 F.2d 453 (5th Cir. 1977)] must always be given. Rather, such a charge is required only where a trial court charges a jury that the commission of any one of several alternative actions would subject a defendant to criminal liability, and those actions are conceptually distinct from each other, and the state has presented some evidence supporting each alternative. The determination of whether actions are conceptually distinct must be made with reference to the purpose behind the proposed charge: to insure that the jurors are in unanimous agreement as to what conduct the defendant committed." We do not believe that *Benite* applies to this case.

The rule which we articulated in *Benite* is limited to a case in which "the actions necessary to constitute a

violation of one statute or subsection of a statute are distinct from those necessary to constitute a violation of another . . . ." Id., 674. The word "another" as used in *Benite* obviously refers to another subsection of the same statute, or to another statutory way of committing a violation of the same statutory subsection. Thus, the *Benite* rule, which requires the trial court in appropriate circumstances to give, even in the absence of a proper request or exception, a fact-specific and closely focused unanimity instruction, only applies where the particular count under consideration by the jury is based on multiple factual allegations which amount to multiple statutory subsections or multiple statutory elements of the offense involved. It does not apply, and such an instruction is not required of the court, where the multiple factual allegations do not amount to multiple statutory subsections or to multiple statutory elements of the offense.

This reading of *Benite* is consistent with the three principal decisions on which it is based. In *United States* v. *Gipson,* supra, the unanimity defect arose because there were six alternative statutorily defined elements presented to the jury without a specific unanimity instruction. See id., 455–56; *State* v. *Benite,* supra, 672. In *State* v. *Jones,* 193 Conn. 70, 475 A.2d 1087 (1984), the unanimity claim was considered because the indictment for felony murder was based on two separate predicate crimes, namely, robbery and attempted robbery. See id., 76–77; *State* v. *Benite,* supra, 673. Similarly, in *State* v. *West,* 3 Conn. App. 650, 491 A.2d 428, cert. denied, 196 Conn. 810, 497 A.2d 906 (1985), the unanimity claim was based on the charge that the defendant committed sexual assault by force or the threat of force, each of which is an alternate statutory element under General Statutes § 53a-70. Id., 654–56; *State* v. *Benite,* supra, 674.

This reading of *Benite* is also consistent with our subsequent applications of it. In *State* v. *Scott,* 11 Conn. App. 102, 121, 525 A.2d 1364, cert. denied, 204 Conn. 811, 528 A.2d 1157 (1987), we declined to afford full *Evans* review to a *Benite* claim because the case did not involve "an information charging alternative *statutory methods* of committing the same crime." (Emphasis in original.) See also *State* v. *Golding,* 14 Conn. App. 272, 279–81, 541 A.2d 509 (1988) (two statutory alternatives); *State* v. *Flynn,* 14 Conn. App. 10, 36–39, 539 A.2d 1005 (1988) (two statutory subsections); *State* v. *Jackson,* 13 Conn. App. 288, 294–97, 535 A.2d 1327 (1988) (two statutory alternatives); *State* v. *Diorio,* 12 Conn. App. 74, 80–82, 529 A.2d 1320, cert. denied, 205 Conn. 813, 532 A.2d 587 (1987), cert. denied,      U.S. , 108 S. Ct. 1025, 98 L. Ed. 2d 990 (1988) (two statutory subsections); *State* v. *LoSacco,* 11 Conn. App. 24, 30–34, 525 A.2d 977, cert. denied, 204 Conn. 812, 528 A.2d 1158 (1987) (three statutory subsections); *State* v. *Edwards,* 10 Conn. App. 503, 510–14, 524 A.2d 648, cert. denied, 204 Conn. 808, 528 A.2d 1155 (1987) (two statutory alternatives); *State* v. *Milledge,* 8 Conn. App. 119, 123, 511 A.2d 366 (1986) (additional statutory elements).

This limitation on the *Benite* rule, moreover, comports with common sense and sound principles by which to view jury verdicts. In most criminal trials, the evidence will allow to one degree or another differing but reasonable views regarding what specific conduct the defendant engaged in which formed the basis of the jury's verdict of guilt. For example, different witnesses may present different versions of the defendant's conduct; and the same witness may testify inconsistently in his description of that conduct, and thus present differing versions of that conduct. In such cases, it is a familiar principle that the jury is free to accept or reject all or any part of the evidence. See *State* v.

*Fullard,* 5 Conn. App. 338, 342, 497 A.2d 1041 (1985). In such cases, however, there is nothing in the constitutional requirement of jury unanimity that requires a specific instruction that the jury must be unanimous with regard to any one of those varying factual versions. As long as the jurors are properly instructed on the legal elements of the crime which must be proved beyond a reasonable doubt, they need not be further instructed that they all must agree that the exact same conduct constituted the proscribed act. In such cases, we safely rely on the presumption that the jury understands and properly follows the court's instruction that its verdict be unanimous; see *State* v. *Servello,* 14 Conn. App. 88, 100, 540 A.2d 378 (1988); and we do not attempt to divine whether that presumption is valid.

Where, however, the jury is presented with alternative, conceptually distinct statutory subsections, or with alternative, conceptually distinct elements of the same statute, as possible bases for guilt, the principles of *Benite* come into play, because it is in those situations that "the possibility that the jurors may actually disagree on which alternative, if either, the defendant violated is the highest." *State* v. *Benite,* supra, 674. In those situations, therefore, we require a specific unanimity instruction as an additional corollary to the usual unanimity instruction. Id., 674–75.

Applying these principles to this case, we conclude that a specific unanimity instruction was not required. The defendant was charged in counts one and two with violations of General Statutes § 53-21, under the statutory theory of creating a harmful situation, rather than committing specific acts. See *State* v. *Dennis,* 150 Conn. 245, 250, 188 A.2d 65 (1963); compare *State* v. *Dumlao,* 3 Conn. App. 607, 614, 491 A.2d 404 (1985) (harmful situation theory) with id., 621–22 (specific act). The kinds of conduct asserted by the state regarding which the defendant now claims the need for a specific unanimity

instruction, namely, engaging in sexual activity with the victims or providing them with alcohol and illegal drugs, are neither alternative statutory subsections nor alternative statutory essential elements. Under these circumstances, *Benite* does not apply, and no such unanimity instruction was required.

Furthermore, the failure of the defendant either to request a specific unanimity instruction, or to except on unanimity grounds, sends a powerful signal that he did not perceive the unanimity principle as being violated. See *State* v. *Coleman,* 14 Conn. App. 657, 684, 544 A.2d 194 (1988). Thus, there is little basis for us, from our "appellate perch"; *Grayson* v. *Grayson,* 4 Conn. App. 275, 293, 494 A.2d 576 (1985), appeal dismissed, 202 Conn. 221, 520 A.2d 225 (1987) (cert. improvidently granted); to believe from this record that the jury misapplied the trial court's repeated instructions that its verdict on each count must be unanimous.

Even if the *Benite* principles were to apply to this case, however, we conclude that under the circumstances present here any error committed by the court in neglecting to give a specific unanimity instruction was rendered harmless by the jury's verdict. *Benite* applies where "the actions necessary to constitute a violation of one statute or subsection of a statute are *distinct* from those necessary to constitute a violation of another . . . . " (Emphasis added.) *State* v. *Benite,* supra, 674. In this case, there are two, not three as claimed by the defendant, conceptually distinct categories: engaging in sexual activity with the victims; and providing them with alcohol and illegal drugs. Giving teenage girls liquor and marihuana are not conceptually distinct actions. They both involve furnishing the underage victims with illegal and mind-altering substances which are harmful to their physical health and induce them to lose their self-control.

The jury, however, acquitted the defendant of the two counts of sexual assault in the second degree, and of the two lesser included counts of sexual assault in the fourth degree. With regard to the counts of sexual assault in the second degree, the court charged the jury that the essential elements were sexual intercourse, defined as vaginal intercourse or fellatio, with a person under the age of fifteen.[9] With respect to the lesser included counts of sexual assault in the fourth degree; General Statutes § 53a-73a; the court instructed the jury that the essential elements were sexual contact with a person under fifteen years of age. The court defined sexual contact as contact with the intimate parts of the victim for the purpose of the defendant's sexual gratification, and it defined the intimate parts of the victim as the genital area, groin, anus, inner thighs, buttocks or breasts, whether clothed or unclothed. See General Statutes § 53a-65 (3).

In its instructions on the two risk of injury counts, moreover, the court specifically limited the definition of "sexual activity" to acts of sexual intercourse and sexual contact, and defined those terms identically to the definitions used under the sexual assault counts. Since the jury acquitted the defendant of both counts of sexual assault in the second degree and the lesser included offenses of sexual assault in the fourth degree, and since the only issue in the case was whether the defendant committed the conduct asserted by the state, we can only conclude that the jury's verdict on the two counts of risk of injury must have been based, not on the evidence of sexual activity, but on the evidence of providing the victims with alcohol and marihuana. Under these circumstances, therefore, the risk of lack of jury unanimity anticipated by *Benite* did not materi-

---

[9] Public Acts 1985, No. 85-341, amended the applicable age to sixteen. See General Statutes § 53a-71.

alize. The jury's verdict must be seen as unanimous with regard to the single concept of providing illegal substances to the victims.

## B

The defendant also argues that the court's response to the jury's inquiry was erroneous because it (1) changed the basis of the risk of injury charges by enlarging them to encompass an uncharged theory of liability, and (2) it rendered the risk of injury counts duplicitous. We have fully reviewed these claims in accordance with the proper scope of review of jury instructions; see *State* v. *Foshay,* 12 Conn. App. 1, 27–28, 530 A.2d 611, cert. granted in part, 205 Conn. 813, 532 A.2d 587 (1987); and find them to be without merit.

## C

The defendant mounts a multi-faceted attack on the court's charge on the credibility of witnesses. He claims that the court erred by failing to instruct the jury in accordance with his requests to charge on the following factors: (1) the fact that, at the time of trial, J1 was in the custody of the commissioner of children and youth services pursuant to a delinquency commitment; (2) the effect of marihuana use by certain witnesses, including J1 and J2; and (3) a list of other factors bearing on credibility.[10]

The defendant relies generally on the principle that a request to charge that is relevant to the case and accurately states the law must be honored; *State* v.

---

[10] Those other factors requested by the defendant which, he claims, the court did not specifically include in its instructions on credibility, were admissions of drug use; accuracy of drug-influenced recollections; acts of misconduct; psychiatric and mental histories; lack of prosecution; inconsistency in testimony; absence of a timely complaint by the victim; contact and communication between witnesses; relationships between witnesses; acts of good citizenship; and lack of motive to testify falsely.

*Shindell,* 195 Conn. 128, 143, 486 A.2d 637 (1985); and its corollary, namely, that a refusal to honor such a request is not erroneous if the substance of the request is given. Id. The premise of the defendant's claim, however, is that where there is evidentiary support for specific instructions regarding credibility factors, the court is obligated upon proper request to include those factors in its instructions. We disagree with this premise.

We recognize that where the evidence warrants, the court is obligated, upon proper request or exception, to give a specific instruction on the credibility of an accomplice; id., 142; and on the credibility of a complaining witness who could himself be culpable depending on the veracity of his version of the events in question. *State* v. *Cooper,* 182 Conn. 207, 212, 438 A.2d 418 (1980). The reason for this requirement is the risk of the "inherent unreliability of such witness." *State* v. *Estep,* 186 Conn. 648, 652, 443 A.2d 483 (1982). We are unaware, however, of any authority in this state, and the defendant has not presented us with any, extending that obligation of the trial court to the myriad of credibility factors involved in the defendant's claim in this case, and we decline the defendant's implicit invitation to impose such an obligation.

Whether jury instructions on credibility should specifically address any of the factors urged here by the defendant is a determination best left to the discretion of the trial court, and the refusal to give such an instruction is erroneous only if, under all the circumstances of the case, it was an abuse of discretion. *State* v. *Cooper,* supra, 217 (*Parskey, J.,* concurring in part and dissenting in part); see also *State* v. *Smith,* 201 Conn. 659, 666–67, 519 A.2d 26 (1986). No such abuse occurred here.

The court instructed the jury generally on "rule[s] of law relating to credibility; how to decide in your own

minds which of the witnesses is telling the truth." We have examined the court's charge on the credibility of witnesses.[11] Considering the instruction as a whole,

[11] The court charged as follows: "You have had a number of witnesses appear before you, and you will be interested in a rule of law relating to credibility; how to decide in your own minds which of the witnesses is telling the truth.

"The credibility of witnesses and the weight to be given to their testimony are matters which it is peculiarly your function to determine.

"No fact is, of course, to be determined merely by the number of witnesses testifying for or against it. It is the quality, and not the quantity, of the testimony which should be controlling.

"In weighing the testimony of a witness, you should consider his or her appearance on the witness stand. In other words, you should try to size the witness up. You should have in mind all those little circumstances which point to his or her truthfulness or untruthfulness. You should also consider any possible bias or prejudice he or she may have, whether for or against the State or for or against the accused, his or her interest or lack of interest of whatever sort in the outcome of the trial, and his or her ability to observe facts correctly and to remember and relate them truly and accurately.

"You should test the evidence the witness gives by your own knowledge of human nature and of the motives which influence and control human action.

"If any facts are admitted or otherwise proven to you, you may well bring those into relation with the testimony and see if they fit together.

"In short, you are to bring to bear upon such testimony the same considerations and to use the same sound judgment you apply to the questions of truth and veracity which are daily presenting themselves for your decision in the ordinary affairs of life.

"The credit that you will give to the testimony offered by the various witnesses is, as I say, something which you must determine.

"Where a witness testifies inaccurately and you do not think that the inaccuracy was consciously dishonest, you should bear that in mind and scrutinize the whole testimony of the witness.

"Thus, if you find that there has been inaccuracy in one respect upon the part of a witness, remember it in judging the rest of his or her testimony and give to it that weight which your own minds lead you to think it ought to have, and which you would attach to it in the ordinary affairs of life where anyone came to you in a matter and you found that in some particular he or she was inaccurate.

"If, however, you conclude that a witness has not only testified falsely but that he has done so intentionally or wilfully, this fact casts a very seri-

without critical dissection, and from the standpoint of whether it gave adequate guidance to the jury in reaching a proper verdict; *State* v. *Foshay,* supra, 27; we conclude that the instruction sufficiently covered the issue of credibility of witnesses, and that the failure of the trial court to address specifically the credibility factors urged by the defendant was not an abuse of discretion.

ous doubt upon all his or her testimony, and you might well conclude that you cannot accept any of it. That, however, is a matter for you to determine.

"And, even though you find that a witness intentionally gave false testimony as to certain matters, you may find that as to certain other matters, he or she gave testimony worthy of acceptance by you as true. After all, whether you should believe all of the witness' testimony, or believe only some portions of it, or none of it, is for you to decide.

"In summary, you bring to bear the same tests, the same considerations, and the same sound judgments that you apply in your everyday life to the truth and veracity of what people tell you, and the weight you give to what they tell you.

"There is testimony in this case from police officers. The testimony of police officers is entitled to no special privilege merely because it comes from police officers.

"A police officer who takes the witness stand subjects his or her testimony to the same examination and the same tests as any other witness does. You should neither believe nor disbelieve an officer merely because he or she is a police officer. As in the case of other witnesses, you should recall his or her demeanor on the stand as it bears on credibility, the substance of the officer's testimony and you should weigh and balance it just as carefully as you would the testimony of any other witness.

"In weighing the testimony of a child, you should also take into consideration the youth of the child. In certain respects, a child is more apt to err than an older person. A child is apt to be more amenable to any influence or suggestion which may be made to the child by older persons, and particularly persons closely related to the child. The child's imagination also often misleads the child. The suggestions made to the child take on the semblance of actual fact and will relate them as such.

"The sanctity of the oath and the solemnity of legal proceedings may appeal to a child less than to an adult. On the other hand, motives of interest and ultimate design or purpose often sway children less than they do an adult.

"Perhaps these suggestions are a submission to indicate to you that in weighing the testimony of a child, the very youth is a factor you should not overlook and make it clear that you should apply it to your own experience of childhood."

## V

### SENTENCING

The defendant claims that the court erred in imposing the sentences because (1) it improperly denied the defendant's motion to strike the presentence investigation report, and improperly relied on that report, and (2) it improperly sentenced the defendant for conduct of which he was acquitted, and in the alternative, the court was required to sentence him on the basis of the least culpable version of the evidence. These claims are without merit.

The "Offense" part of the presentence report summarized the statement of the victims to the police on which the warrant for the defendant's arrest was based. This summary focused on the victims' statements describing the sexual activities of the defendant with the victims, and described the defendant's providing them with liquor and marihuana. This section concludes: "Based on this information a warrant was issued charging [the defendant] with the instant offense." The "Offenders Version" section reported the defendant's denial of having engaged in sexual activities with the victims, and his denial of having furnished them with liquor and marihuana.

The "Victim's Attitude" section of the report detailed, inter alia, the attitudes expressed by the parents of the victims. The mother of J1 stated that J1 was in residential treatment pursuant to a commitment by the juvenile court to the department of children and youth services, and that she "felt that her daughter's present problems are the result of the instant offense." She also reported her daughter's feeling that it was unfortunate that the jury did not believe that sexual activity had occurred. The father of J2 stated, inter alia, that she was "not attending school which he feels is a direct

result of the instant offense and the trial," that she is not yet ready to "talk it out with someone," and he hoped that "when it's all over she will return to school and seek professional help to get over the embarrassment and guilt."

The report then contains a complete statement of the defendant's current personal history. It concludes as follows: "Based on the victims' attitudes and the account of the instant offense, it appears [the defendant] used the benefits of his success to get what he wanted, overlooking what effect it might have had on the two young girls involved. It appears only a period of incarcerat[ion] will do justice to those hurt by the offender's actions and hopefully make others in the community aware that those in a position such as the offender are not above the law."

We first consider the defendant's claim regarding the presentence investigation report. The defendant's claim consists of a broadside attack on the report as containing "derogatory information that was false, unreliable, and of which the jury had acquitted the defendant." More specifically, the defendant argues that the report based its recommendation of incarceration on the victims' sexual allegations which the jury, by its verdict on the sexual assault counts, rejected,[12] and that the court improperly relied on the report and its recommendation in imposing the sentences. The defendant's arguments are without merit.

---

[12] The defendant also argues that the report was flawed because it did not present a fair summary of the evidence against the defendant; it ignored important evidence presented at the trial; it referred to evidence about J2's background "which the State apparently deemed not sufficiently trustworthy to offer at trial"; and, in response to the statements in the report of the victims' parents attributing subsequent problems of the victims to the defendant's conduct, the report ignored testimony at trial about the victims' familiarity with drugs and alcohol before meeting the defendant.

"Consistent with due process the trial court may consider responsible unsworn or out-of-court information relative to the circumstances of the crime and to the convicted person's life and circumstances. *Williams* v. *Oklahoma,* 358 U.S. 576, 584, 79 S. Ct. 421, 3 L. Ed. 2d 516 (1959). It is a fundamental sentencing principle that a sentencing judge may 'appropriately conduct an inquiry broad in scope, and largely unlimited either as to the kind of information he may consider or the source from which it may come.' *United States* v. *Tucker,* 404 U.S. 443, 446, 92 S. Ct. 589, 30 L. Ed. 2d 592 (1972). The trial court's discretion, however, is not completely unfettered. As a matter of due process, information may be considered as a basis for a sentence only if it has some minimal indicium of reliability. *United States* v. *Baylin,* 696 F.2d 1030, 1040 (3d Cir. 1982). As long as the sentencing judge has a reasonable, persuasive basis for relying on the information which he uses to fashion his ultimate sentence, an appellate court should not interfere with his discretion." *State* v. *Huey,* 199 Conn. 121, 127, 505 A.2d 125 (1986).

"[T]he mere reference to information outside the record does not require a sentence to be set aside unless the defendant shows: (1) that the information was materially false or unreliable; and (2) that the trial court substantially relied on the information in determining the sentence." *State* v. *Collette,* 199 Conn. 308, 321, 507 A.2d 99 (1986). These principles compel the conclusion that the court did not err in denying the defendant's motion to strike the presentence report.

First, we know of no basis for the court to strike an entire presentence report. Our rules provide that defense counsel should bring to the court's attention "any inaccuracy in the presentence report of which he is aware or which the defendant claims to exist." Practice Book § 925. The defendant's counsel did so in this case at the sentencing proceedings.

More significantly, the defendant's argument misconceives the function of a presentence report in a case such as this, where the report follows a trial. To the extent that the offense portion of the report repeated the pretrial statements of the victims and did not refer to the evidence produced at trial, it can hardly be faulted. Certainly the writer did not at that time have access to the fifteen volumes of trial transcript, and neither the parties nor the court expected him to base his report on that evidence. Furthermore, the writer could not have known, without that transcript, including the transcript of the court's jury instructions, that the acquittal of the sexual assault charges could be interpreted as an acquittal on the part of the risk of injury charges involving sexual activity.

Nor was there anything false in the report. It accurately reported the offenses of which the defendant was convicted and acquitted, and it explicitly presented the defendant's offenses, not as what was disclosed by the evidence, but as the basis of his arrest. Furthermore, it balanced that statement by the defendant's version, which repeated his denial of guilt. Similarly, the victims' attitudes were presented simply as that, and no more.

Finally, it is highly unlikely, if not inconceivable, that the sentencing judge relied in any way on the part of the report describing either the offense or the defendant's version. The judge had presided over the entire trial, and had heard all the evidence. It is fanciful to think that, in imposing sentence, he ignored the evidence he had heard presented to the jury, and relied instead on the description of the offenses contained in the report.

We turn, then, to the defendant's arguments that the court erred because (1) it sentenced the defendant for acts of which he was acquitted, and (2) in view of the

"ambiguity of the verdict," it failed to sentence the defendant in accordance with "the least culpable alternative." We disagree.

In its sentencing remarks, the court stated: "I do not find the jury verdict and the law so provides of 53-21 and the allegations of which you were found not guilty to be inconsistent concerning sexual allegations. But, the delivery of marihuana to young people to these little girls, these adolescents who are weak to begin with because of their family background, the delivering of alcohol to them, the sexual activities, the whole atmosphere, penthouses, hot tubs, the whole thing, has just revolted this Court to an unbelievable standard that our society today with all of its successes, that you have had to become so involved with little girls with your background and economic wealth, you could be amoral as you wanted to be within the law. But, you chose to step across the law."

We do not read the trial court's sole reference to "sexual activities," taken in context, necessarily to refer to the sexual conduct of which the jury's verdict acquitted the defendant, namely, sexual intercourse and sexual contact as defined in the jury instructions. There was abundant evidence of other conduct of a sexual nature by the defendant with the victims, which would not be strictly within the definitions of "sexual activity" given by the court to the jury, namely, asking and paying them to expose their breasts and genitals to him, engaging in nude hot tub baths with him, *attempting* to fondle their breasts, and kissing them. Thus, the court's remarks hardly compel the conclusion that it sentenced the defendant for conduct of which the jury acquitted him. Furthermore, even if we were to read the court's reference to "sexual activities" as referring to the sexual intercourse and sexual contact involved in the sexual assault charges, the court was well within

its broad discretion in taking that information into account in imposing sentence.

Due process does not require that sentencing information be established beyond a reasonable doubt. *McMillan* v. *Pennsylvania,* 477 U.S. 79, 84, 106 S. Ct. 2411, 91 L. Ed. 2d 67 (1986); *State* v. *Huey,* supra. In conducting its broad sentencing inquiry, the court may consider information largely unlimited in kind or source, so long as it has "some minimal indicium of reliability." *State* v. *Huey,* supra; *State* v. *Golding,* 14 Conn. App. 272, 283, 541 A.2d 509 (1988). This includes "evidence bearing on charges for which the defendant was acquitted." *State* v. *Huey,* supra, 126.

In this case, the court did not, as claimed by the defendant, sentence him on charges of which he had been acquitted. It is clear from the court's remarks that the defendant's sexual activities were simply one of several factors involved in the sentence. These activities, grounded in the evidence, had a sufficient indicium of reliability for use by the court in sentencing. The fact that the jury did not find all of the essential elements of the sexual assault charges proven beyond a reasonable doubt did not prevent the sentencing judge from appropriately considering that same evidence in imposing sentence.

The second prong of the defendant's challenge to the court's sentence is that, because the verdict was ambiguous, the court was obligated to impose a sentence based on the least culpable version of the evidence, namely, that the defendant did no more than simply permit the victims to drink beer at his home. The defendant's argument posits "a proposition for which he offers no authority other than assertion." *State* v. *Levine,* 5 Conn. App. 207, 209, 497 A.2d 774, cert.

denied, 197 Conn. 816, 500 A.2d 1337 (1985). Furthermore, there was nothing ambiguous about the verdict that we can perceive.

There is no error.

In this opinion the other judges concurred.